RECEIVED JUL 26 2018 8:30 ____M WILLIAM T. WALSH CLERK

NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

SCHERER DESIGN GROUP, LLC,

Plaintiff,

v.

CHAD SCHWARTZ; AHEAD
ENGINEERING LLC; FAR FIELD
TELECOM LLC; KYLE MCGINLEY;
DANIEL HERNANDEZ; and RYAN
WALDRON,

Defendants.

Civ. No. 18-3540

OPINION

THOMPSON, U.S.D.J.

## INTRODUCTION

This matter comes before the Court on a motion for a preliminary injunction by Plaintiff Scherer Design Group, LLC ("Plaintiff" or "SDG"). (ECF No. 1.) Defendants Chad Schwartz, Ahead Engineering LLC, Far Field Telecom LLC, Kyle McGinley, Daniel Hernandez, and Ryan Waldron (collectively, "Defendants") oppose. (ECF No. 37.) The Court has decided this Motion based on the written submissions of the parties and oral argument held on July 11, 2018. For the reasons stated herein, Plaintiff's Motion is granted.

## BACKGROUND

Plaintiff is a consulting engineering firm in the telecommunications industry, specializing in the "design and engineering of antennas and antenna systems for wireless carriers and associated providers of wireless connectivity," founded by Colleen Connolly and Glenn Scherer.

1

(Compl. ¶¶ 11–12, ECF No. 1.) Its clients are wireless carriers and third-party vendors who contract with carriers for antenna installation. (*Id.* ¶ 18.) Plaintiff claims that Defendants Chad Schwartz, Daniel Hernandez, Kyle McGinley, and Ryan Waldron—four of its former employees—coordinated the appropriation of Plaintiff's trade secrets prior to their mass resignation to use for competition. (*See, e.g., id.* ¶ 65.)

Schwartz worked with Plaintiff's predecessor engineering firm since 2000 and served as a senior engineer and Director of Engineering at SDG. (*Id.* ¶ 48.) On November 27, 2017, after months of disagreement with Plaintiff regarding his future role and potential partnership, Schwartz resigned, effective December 8, 2017. (*Id.* ¶¶ 53–55.) Schwartz subsequently formed two of his own consulting engineering firms, Defendants Ahead Engineering LLC and Far Field Telecom LLC. (*Id.* ¶ 56.) Defendant Ahead Engineering is a self-described "full-service telecom engineering firm," and Defendant Far Field is a company that offers "innovative cost-effective solutions of oDAS and small cell site concealment." (*Id.* ¶¶ 57, 59 (quoting each company's LinkedIn profile).) "On January 16, 2018, [Defendants] Hernandez, McGinley[,] and Waldron resigned from their positions at SDG and officially became, respectively, Principal of [D]efendant Far Field, Director of Engineering for [D]efendant Ahead Engineering, and Director of Business Processes for [D]efendant Far Field." (*Id.* ¶ 98.) Schwartz is president of both entities/corporate Defendants. (*Id.* ¶ 97.)

Plaintiff claims that leading up to their January 2018 resignations, Hernandez, McGinley, and Waldron downloaded files from Plaintiff's "proprietary relational database." (*See, e.g., id.* ¶¶ 13–14.) According to Plaintiff, this database is an "invaluable" bank of information, including "original survey data, published specifications[,] and dozens of other critical data points relating to each of the 10,000 antenna projects its predecessors and staff have designed"

2

over the past 20 years. (*Id.* ¶ 14; *see also id.* ¶¶ 25–28 (describing nature of data in greater detail).) Plaintiff's database also included a specially-developed "ExteNet Automation System" for a client ExteNet that "dominates the market for building out wireless broadband data in and around New York City." (*Id.* ¶¶ 33, 35–36.) This system analyzes, integrates, and converts data into the documentation ExteNet needs to seek approval with the government and wireless providers, improving Plaintiff's turnaround with ExteNet work, creating a competitive advantage, and dramatically increasing billing for ExteNet. (*Id.* ¶¶ 37, 39, 41.) Plaintiff expected its billings and revenue from ExteNet to triple in 2018. (*Id.* ¶ 42.)

Plaintiff alleges that "Hernandez, McGinley[,] and Waldron were directed by Schwartz and other employees of Ahead Engineering and [Far] Field to systematically copy SDG computer files they anticipated using at their new firms," in order to "compete with SDG on the strength of SDG's technology, data, clients." (*Id.* ¶ 47.) After Hernandez resigned, Plaintiff accessed a Facebook conversation between Defendants through Hernandez's Facebook account Messenger application on his SDG computer. (*Id.* ¶ 74.) The extensive Messenger conversation discusses the download of files from Plaintiff's database while Hernandez, McGinley, and Waldron were still employed by Plaintiff (*see* Compl. ¶¶ 77–87 (exhibits of screenshots of a conversation between Defendants and associates at Ahead Engineering and Far Field)), which Plaintiff asserts is corroborated by the use and removal of USB drives on SDG computers and the files that were contemporaneously accessed, shown on the computer's recent places location finder (*id.* ¶¶ 75, 89–93). The communications also discuss emptying their offices prior to officially resigning (*id.* ¶ 80) and Defendants' plans for the formal formation of the companies, such as non-solicitation and non-compete agreements and meetings with the accountant (*id.* ¶¶ 82–83).

3

On February 18, 2018, Plaintiff's counsel sent Defendants cease and desist letters, asking for the return of proprietary information taken from Plaintiff and for the preservation of data. (*Id.* ¶ 99.) On March 12, 2018, Plaintiff filed this lawsuit in the New Jersey Superior Court, Law Division, Hunterdon County, against the four past employees and two new engineering firms, pleading seven Counts: (I) Misappropriation of Trade Secrets and Violation of the New Jersey Trade Secrets Act ("NJTSA"), N.J.S.A. 56:15-1, *et seq.*; (II) Violations of the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839, *et seq.*; (III) Breach of Duty of Loyalty; (IV) Tortious Interference with Prospective Business Relationships; (V) Conversion; and (VI) Conspiracy. (*See generally* Compl.; *see also* Notice of Removal ¶ 1, ECF No. 1.)[1] Plaintiff filed an order to show cause for temporary restraints and application for preliminary injunction with its Complaint. Defendants removed to this Court. (ECF No. 1.)

The Court held two hearings on Plaintiff's temporary restraining order ("TRO") on March 16, 2018 (ECF No. 7) and April 3, 2018 (ECF No. 13) and issued a TRO on April 4, 2018 (ECF No. 14). The TRO generally preserved electronically-stored information, avoided the loss or alteration of said data and the devices on which it is stored, and enjoined Defendants from soliciting any of Plaintiff's present clients (who were clients between December 2017 and January 17, 2018). (*See* ECF No. 14.) The parties agreed to and subsequently engaged in expedited discovery. A preliminary injunction hearing was scheduled for April 23, 2018 (*id.*), then rescheduled at the parties' request for June 6, 2018 (ECF Nos. 18, 20), and in late May, they sought a two-week extension (ECF Nos. 27, 29). After a status call on May 30, 2018, the parties

---

[1] Defendants have since filed an Answer and Counterclaim, as well as an Amended Answer and Counterclaim, both pleading: (I) Invasion of Privacy by Intrusion Upon Seclusion, (II) Invasion of Privacy by Public Disclosure of Private Acts, (III) False Light Invasion of Privacy, and (IV) Tortious Interference with Contractual and Business Relations. (*See generally* ECF Nos. 21, 28.) The Court granted Plaintiff's motion to dismiss Defendants' Counts II and III. (ECF Nos. 23, 45, 46.)

4

agreed to handle the preliminary injunction without an evidentiary hearing. (ECF Nos. 30, 33.) The Preliminary Injunction Motion was fully briefed (ECF Nos. 37–41), and oral argument was heard on July 11, 2018 (ECF No. 45). At oral argument, the Court indicated that the protections of the TRO would continue pending an opinion on the preliminary injunction. The Court now considers Plaintiff's application.

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 establishes the guidelines and requirements for injunctions. *Chaves v. Int'l Boxing Fed'n*, 2016 WL 1118246, at *1 (D.N.J. Mar. 22, 2016). The grant or denial of a preliminary injunction is within the discretion of the court. *See Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994). The decision to issue a preliminary injunction is governed by a four-factor test, wherein the plaintiff must demonstrate:

> (1) that they are reasonably likely to prevail eventually in the litigation and (2) that they are likely to suffer irreparable injury without relief. If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiffs and (4) whether granting relief would serve the public interest.

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (quoting *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)).

A preliminary injunction is an "extraordinary remedy, which should be granted only in limited circumstances," *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989), and is "never awarded as of right," *Groupe SEB USA, Inc. v. Euro-Pro Operating,*

5

*LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

## DISCUSSION

### I. Threshold Argument: Unclean Hands

In opposition to Plaintiff's application, Defendants raise a threshold argument of unclean hands that the Court will address first. Defendants argue that Plaintiff's unconscionable conduct and unclean hands in this case foreclose it from seeking equitable relief or being entitled to a preliminary injunction. (Defs.' Opp'n at 4, 12, ECF No 37.)

According to Defendants, Plaintiff—by and through IT specialist Jason Gerstenfeld—violated their privacy rights when it utilized a password recovery tool to access Hernandez's Facebook account daily for six weeks to collect information for this lawsuit, downloaded a special application to prevent Hernandez from knowing it viewed the Facebook account, and accessed Hernandez's other personal accounts, including his bank account. (*See id.* at 1, 6–7, 9; *See* Computer Forensics Report for Digital4nx Group, Defs.' Ex. D, ECF No. 37-1.) In response, Plaintiff submitted a declaration by Gerstenfeld asserting that Hernandez had not fully logged out and denying that he took such surreptitious actions. (Gerstenfeld Decl. ¶¶ 5–6, 19, ECF No. 38-6.) Plaintiff also asserts that it was entitled to access these accounts because they were left open on a company laptop. (Scherer Dep. 145:8–17; 150:12–151:2, Defs.' Ex. A, ECF No. 37-1.) At oral argument, Plaintiff represented that even if its conduct were improper, it does not warrant a finding of unclean hands or inoculate the value of its litigation and the relief sought.

At oral argument for both the TRO and preliminary injunction, the Court emphasized that it would not entertain Defendants' claims of privacy violations in their originally-presented form:

6

quasi-Fourth Amendment, fruit of the poisonous tree claims. Defendants now couch this argument as one for unclean hands. "To prevail on an unclean hands defense, the defendant must show fraud, unconscionability, or bad faith on the part of the plaintiff." *Malibu Media, LLC v. Lee*, 2013 WL 2252650, at *8 (D.N.J. May 22, 2013) (internal citations omitted). The conduct must: (1) bear direct relation to the matter in litigation/before the Court, (2) injure the other party, and (3) affect the balance of equities. *Id.* The relatedness factor is strictly construed. *See Ace Am. Ins. Co. v. Wachovia Ins. Agency*, 2008 WL 4630486, at *11 (D.N.J. Oct. 17, 2008).

The parties hotly dispute the factual foundation of this argument: whether Hernandez truly logged out of his Facebook account such that it should have been inaccessible to Gerstenfeld. (*See, e.g.*, Defs.' Sur-reply at 2, ECF No. 41.) As the Court addressed at oral argument on April 3, 2018, it may be reasonable and does not necessarily amount to an intrusion upon seclusion for an employer to have access to and view password-protected content on a company laptop. *See Stengart v. Loving Care Agency, Inc.*, 990 A.2d 650, 661, 662–63 (N.J. 2010) (noting case-by-case analysis required for such claims; finding the employee had an expectation of privacy when attorney-client communications involved). Moreover, this conduct is arguably not related to the litigation to find unclean hands. While it goes to Plaintiff's full knowledge of the underlying facts, it does not affect the potential breaches of loyalty, tortious interference, and/or trade secret violations that are the subject of the litigation and which occurred prior to Plaintiff's alleged hacking of Hernandez's account. On balance, the Court is not persuaded that Plaintiff's "unclean hands" should bar its right to pursue injunctive relief. Therefore, the Court turns next to the four-factor preliminary injunction analysis.

## II. Preliminary Injunction Factors

Plaintiff largely rests on its success on the TRO, asserting that there has been no change in the law or new evidence; therefore, it has already demonstrated it is entitled to a preliminary injunction. (Pl.'s Suppl. Mem. at 4–6, ECF No. 38 (invoking the law of the case doctrine).) The Court is not persuaded by this rationale. Noting the fulsome briefs Defendants have supplied in opposition and the extent of discovery that has occurred since the TRO was issued (*see* Defs.' Sur-reply at 3 n.4), the Court will conduct a full analysis of the claims on which it appears Plaintiff seeks injunctive relief and the remaining equitable factors.

### A. <u>Likelihood of Success on the Merits</u>

#### 1. *Misappropriation of Trade Secrets: Counts I and II*

Violations of NJTSA and DTSA both require: "(1) the existence of a trade secret and (2) the misappropriation of that secret." *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 2018 WL 1374023, at *6 (D.N.J. Mar. 16, 2018) (citing 18 U.S.C. § 1839(3), (5); N.J.S.A. 56:15-2). For courts in this District, the analysis under DTSA folds into that of NJTSA. The essential inquiry for a trade secret is whether the information derives economic value, the information is not readily ascertainable by other means, and the holder endeavors for it to remain confidential. *Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 157 F. Supp. 3d 407, 423 (D.N.J. 2016) (quoting N.J.S.A. 56:15-2); *see also Samsung Am. Inc. v. Park*, 2006 WL 3627072, at *16 (N.J. Super. Ct. Ch. Div. Dec. 11, 2006) (citing Restatement (First) of Torts § 757 cmt. b (Am. Law Inst. 1939)) (listing six factors, including the extent known inside and outside business, measures taken to guard secrecy, value of information to business and competitors, money and effort expended in developing information, ease with which acquired or duplicated). A plaintiff must

have taken "precautions to maintain the secrecy of the trade secret." *Mu Sigma, Inc. v. Affine, Inc.*, 2013 WL 3772724, at * 8 (D.N.J. July 17, 2013).

According to Plaintiff, Defendants took 77,732 files from its database: (1) 8,307 SDG client documents, (2) 68 Tilson client drawings, and (3) entire SDG email accounts of Defendants Hernandez and McGinley. (Pl.'s Reply at 3, ECF No. 40.) Plaintiff describes the proprietary nature of the files in detail: construction plans (drawings, building, safety, and code specifications); calculation spreadsheets and internal analysis tools for expedited schedules and quality deliverables; computer-aided design files and macros; the ExteNet Automation System; and files related to general project deliverables. (*See* Connolly Decl. ¶¶ 43–44, 48–49, 51–53, 67–68, ECF No. 38-1). Even where this information might be publicly available, Plaintiff asserts that its effort in collecting, collating, organizing, and arranging the contents of the database makes it of great value to another business and gave Plaintiff a competitive edge. (Pl.'s Suppl. Mem. at 5; Connolly Decl. ¶¶ 41, 46.)

Defendants argue that because Plaintiff failed to take any measures to protect this information, it does not rise to the level of a trade secret, and Plaintiff thus cannot demonstrate a likelihood of success on the claim. (Defs.' Opp'n at 14–15.) At oral argument, Defendants emphasized that Plaintiff had no password protection, policies or labels, nor agreements—non-compete, non-solicitation, confidentiality, etc.—in place to protect this information. Plaintiff did not rebut this point, and there is deposition testimony from Scherer during defense examination about measures Plaintiff *did not* take to truly protect this information. (*See* Scherer Dep. 38:19–39:5, 88:2–9, 89:2–8, Defs.' Ex. A, ECF No. 37-1.) While it is true that the absence of a non-disclosure or non-compete agreement is not dispositive to this analysis, *see Comprehensive Med. Commc'ns, Inc. v. Pinnacle Commc'ns Grp., Inc.*, 2005 WL 280452, at *15 (N.J. Super. Ct. App.

Div. Jan. 31, 2005) (noting NJ courts have previously found information a protectable trade secret absent such agreements), Plaintiff has not described any measures taken to ensure confidentiality, other than the assertion that the database is "only accessible to authorized staff at SDG[] and could only be accessed through SDG's secure Windows-based domain network and SDG-supplied and -configured computers" (Compl. ¶ 44). The Court cannot conclude that Plaintiff has met its burden on this essential element of both trade secret claims. Accordingly, it is not likely that Plaintiff will succeed on the merits on Counts I and II.

2. *Breach of the Duty of Loyalty: Count III*

New Jersey common law ascribes "a duty of loyalty that dictates that while [employees] are employed, they refrain from acting contrary to the employer's interests." *Comprehensive Med. Commc'ns., Inc.*, 2005 WL 280452, at *17. The duty is comprised of "certain very basic and common sense obligations," derived from principles of agency. *Lamorte Burns & Co. v. Walters*, 770 A.2d 1158, 1168 (N.J. 2001) (citing Restatement (Second) of Agency § 393 (Am. Law Inst. 1958)). Courts look to four factors to determine breach:

> 1) the "existence of contractual provisions" relevant to the employee's actions; 2) the employer's knowledge of, or agreement to, the employee's actions; 3) the "status of the employee and his or her relationship to the employer," e.g., corporate officer or director versus production line worker; and 4) the "nature of the employee's [conduct] and its effect on the employer."

*Kaye v. Rosefielde*, 121 A.3d 862, 870 (N.J. 2015) (alterations in original) (quoting *Cameco, Inc. v. Gedicke*, 724 A.2d 783, 791 (N.J. 1999)). More specifically, an employee must not engage in "secret acts of competition while still employed," *Comprehensive Med. Commc'ns., Inc.*, 2005 WL 280452, at *17 (citing *Auxton Comput. Enters., Inc. v. Parker*, 416 A.2d 952, 955 (N.J. Super. Ct. App. Div. 1980)), nor take "affirmative steps to injure the employer's business," *Lamorte*, 770 A.3d at 1170. "Assisting an employer's competitor can constitute a breach of the

employee's duty of loyalty." *Cameco, Inc.*, 724 A.2d at 786 (citing Restatement (Second) of Agency § 394 cmt. a).

First, Defendants examine each individual and corporate Defendant and detail why Plaintiff cannot succeed: Schwartz ended his employ with Plaintiff long before the alleged conduct, and the corporate Defendants are entities that cannot owe said duty. (Defs.' Opp'n at 22–24.) Plaintiff responds that Schwartz worked as a sub-consultant and thus owed a duty under a principal-agent theory and that he cannot induce, aid, abet, direct, or benefit from the disloyalty of others. (Pl.'s Reply at 4–5 (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 634 (3d Cir. 2007)).) Upon Defendants' challenge at oral argument, Plaintiff referred to its Complaint and clarified that this "aiding and abetting" argument is one of inducement. (*See* Compl. ¶¶ 112, 135.)

The case on which Plaintiff relies for its inducement theory discusses aiding and abetting the breach of a corporate fiduciary duty. *See VFB LLC*, 482 F.3d at 634. But the Third Circuit in *VFB* cited *Franklin Medical Associates v. Newark Public Schools*, 828 A.2d 966 (N.J. Super. Ct. App. Div. 2003), for the general principle that "[a] person who . . . intentionally causes or assists an agent to violate a duty to his principal is subject to liability to the principal." 828 A.2d at 975 (citing Restatement (Second) of Agency § 312); *see also Twp. of Wayne v. Messercola*, 789 F. Supp. 1305, 1311 (D.N.J. 1992) (discussing a third party's liability for inducing breach of a duty by an agent through bribery). Plaintiff pleads that "Defendant[] Schwartz . . . willfully and maliciously induced Hernandez, McGinley, and Waldron to induce their loyalties." (Compl. ¶ 135.) For example, in the Facebook Messenger conversation on January 9, 2018, after Defendant Schwartz announced new work orders he received, he then urged Defendant Waldron to prepare for his departure from SDG to work with Defendant Far Field:

11

> I'd slowly start removing your property. As soon as I get the $ from SDG, you
> are free to go.
> ... and let me verify tomorrow that we'll be able to get you paid too.

(*Id.* ¶ 81.)

Moreover, an agent-principal relationship is the basis for New Jersey's common law duty of loyalty in the employment context. *See* Restatement (Second) of Agency § 397; *id.* cmt. a. The exact nature of the "consultant" relationship between Plaintiff and Schwartz is unclear and disputed. (*See* Am. Answer ¶ 62, ECF No. 28.) Yet Plaintiff has pled facts that imply some form of agency relationship persisted following Schwartz's formal resignation (*see* Compl. ¶¶ 62–63; Pl.'s Reply at 4), and Defendants recognize that Schwartz and Plaintiff attempted to negotiate an agreement to memorialize said relationship (*see* Defs.' Opp'n at 22 n. 13; Connolly Dep. 16:21–17:11, Defs.' Ex. E, ECF No. 37-1 (discussing potential contract to memorialize sub-consultant relationship)). During that time, Schwartz alluded to his own dubious conduct while discussing the implementation of formal agreements between himself and the other Defendants for the new firms:

> Also, I'd be wise to have non-competes and non-solicits for
> partners/employees for all members in both companies. Does anybody
> have an issue with that? That'd mean you can't go off on your own, steal
> clients, employees and compete with the other partners. These are things
> SDG is wishing they had about now .... What if I take all AE's clients
> and start my own company doing the exact same thing? Would you want
> me to do that to do you? Well guess what. I wouldn't want you to do it to
> me, either. And SDG is pretty sorry they didn't lock me down too.

(Compl. ¶ 82.) Conversely, the corporate Defendants/entities were never engaged in any agency relationship with Plaintiff, and therefore, owed Plaintiff no duty. And unlike with respect to Schwartz, the Court cannot conclude that these entities induced or incited the other individuals to breach their duties of loyalty.

12

Next, Defendants argue that the remaining three individual Defendants—Hernandez, McGinley, and Waldron—engaged in reasonable preparation for future employment. (*See* Defs.' Opp'n at 23–24.) Plaintiff, however, points to the fact that Hernandez changed client log-in credentials, allegedly so that he could access the client's site for future work (Hernandez Dep. 30:2–11, Connolly Decl., Ex. B, ECF No. 38-3); Waldron did outside work for ExteNet and Schwartz (Waldron Dep. 25:7–22, Ex. H, ECF No. 37-1); McGinley allegedly failed to bill and invoice certain work prior to his departure (Scherer Dep. 76:7–77:20); and Hernandez allegedly ignored work orders (Pl.'s Reply at 4; Connolly Decl. ¶¶ 34–38). This conduct may be found to be against Plaintiff's interests and for competitive use, evidencing disloyalty beyond planning and preparation. *See Forman Indus. Inc. v. Blake-Ward*, 2008 WL 4191155, at *7 (N.J. Super. Ct. App. Div. Sept. 15, 2008).

Most salient is their download of large amounts of company data in anticipation of resignation, arguably to use in competition with Plaintiff and thus against its interests. *See Comprehensive Med. Commc'ns, Inc.*, 2005 WL 280452, at *17. The duty of loyalty prohibits taking protected information from an employer for competition or in anticipation thereof. *Lamorte*, 770 A.2d at 1169 (collecting cases from various jurisdictions) (finding defendants breached duty when they "intentionally began a process of subverting their employer's business while still employed," such as gathering protected information); *Platinum Mgm't, Inc. v. Dahms*, 666 A.2d 1028, 1043 (N.J. Super. Ct. App. Div. 1995) (finding defendant's telecopying of customers the day after resignation to make appointments on behalf of competitor breached duty). Such information need not rise to the level of a trade secret to constitute a violation of the duty of loyalty. *See Samsung Am. Inc.*, 2006 WL 3627072, at *15 (noting information need not be a trade secret to be protected, must look to relationship of parties and intended use).

13

Hernandez, McGinley, and Waldron downloaded and transmitted/emailed specific site examples and data spreadsheets to the other associates with Ahead Engineering and Far Field. (*See* Connolly Decl. Exs. C, D, ECF Nos. 38-4, 38-5; Compl. ¶¶ 85–86, 94.) They did so in response to specific requests for client information and examples, presumably for future competitive use. (*See, e.g.*, Compl. ¶ 94 ("[D]efendant McGinley says, 'let me know if you need me to access the server to send an example. I'll also look for NJ, NYC, NYS and PA non-ExteNet sites for reference.'"); *id.* ("[D]efendant Waldron asks, "Sure. Do you guys want the CAD too or just the PDF?'"); *see also id.* ¶ 85 (conversation demonstrating Hernandez sent a spread sheet to a partner of Schwartz's when prompted by the question "Any chance I could get that snow load calculation spread sheet from SDG?").) Defendants' conduct here went beyond the mere preparation to go into competing business and is more akin to amassing information and targeting clients like the *Lamorte* defendants. *Samsung Am. Inc.*, 2006 WL 3627072, at *17. Therefore, it is likely that the individual Defendants breached their duty of loyalty in downloading files from Plaintiff's servers and database.

### 3. *Tortious Interference with Prospective Economic Relations: Count IV*

"Under New Jersey law, a claim for tortious interference with prospective economic relations requires that the plaintiff establish: (1) a reasonable expectation of economic advantage; (2) that economic advantage was lost as a direct result of defendant's malicious interference; and (3) plaintiff suffered damages." *Beverly Hills Motoring, Inc. v. Morici*, 2015 WL 248352, at *4 (D.N.J. Jan. 20, 2015) (citing *Lamorte*, 770 A.2d at 1170). Some courts have further delineated these factors, requiring that the plaintiff prove "in the absence of interference, the reasonable probability that [the plaintiff] would have received the anticipated economic benefit." *NY Mach.*

14

*Inc. v. Korean Cleaners Monthly*, 2018 WL 2455926, at *4 (D.N.J. May 31, 2018) (alteration in original) (internal citations omitted).

Plaintiff alleges that Defendants had a deliberate plan to divert SDG clients to Ahead Engineering and Far Field. (Pl.'s Suppl. Mem. at 5.) With Sam Compton from ExteNet, Defendants "were engaged in a conspiracy to fraudulently paint SDG's work in a negative light." (Connolly Decl. ¶¶ 12–14 (claiming Compton and Defendants found reasons to justify pulling work from SDG); *see also* Compl. ¶ 43.) Plaintiff notes that it subpoenaed Defendants and ExteNet for communications between Compton and Schwartz, but neither has complied. (Pl.'s Reply at 4 n.2.) Defendants respond that there was no deliberate plan—ExteNet stopped using Plaintiff because it turned down ExteNet work in late December, and its work quality and timeliness was sub-par. (Defs.' Opp'n at 17–19; Compton Dep. 40:3–41:16, Def.'s Ex. F, ECF No. 37-1.) The legitimacy of this explanation is heavily disputed. Outside of speculative declarations and deposition testimony, Plaintiff has little evidence that there was any tortious interference with ExteNet directly or that Defendants' conduct with ExteNet was malicious, or "wrongful, intentional interference." *NY Mach. Inc.*, 2018 WL 2455926 (internal citations omitted).

Moreover, Plaintiff again emphasizes Hernandez's change of the Tilson log-in credentials so that SDG could not access it in the future and his purposefully avoiding Tilson work orders, thus interfering with and hindering prospective economic relations and potential future contracts. Hernandez Dep. 30:2–11; Connolly Decl. ¶¶ 16–17, 24–25.) But Plaintiff has not presented adequate evidence for the Court to conclude that Defendants' conduct had a causal relationship with the loss of any client work or relationships and that it would have received certain contracts

15

but-for Defendants' conduct. Accordingly, Plaintiff cannot demonstrate a strong likelihood of success on this claim.

On balance, Plaintiff has demonstrated a strong likelihood of success on the merits of its breach of the duty of loyalty claim as to Defendants Schwartz, Hernandez, McGinley, and Waldron (Count III), but not as to its trade secrets or tortious interference claims.

B. Irreparable Harm

Plaintiff asserts that it has experienced, and will continue to face, sabotage to its business absent an injunction. It highlights that it has already lost its largest client, ExteNet, and it lost multiple critical staff in a short period of time, forcing other staff to work overtime. (Connolly Decl. ¶¶ 72, 75; Scherer Dep. 26:9–16.) At oral argument, counsel represented a loss of approximately $1.5 million to date. Plaintiff also highlights that in this small industry, relationships and reputations are extremely important, and Defendants have evidenced a vindictiveness and maliciousness towards Plaintiff's business. (Connolly Decl. ¶¶ 71, 74.) Defendants argue, however, that irreparable harm is defeated because financial statements produced during discovery prove that Plaintiff's "claims of going out of business and imminent business destruction were greatly exaggerated and overblown." (Defs.' Opp'n at 4 n.2, 25–26.)

Economic harm alone, compensable through monetary damages after judgment on the merits, is insufficient for a showing of irreparable harm in this context. *See Acierno*, 40 F.3d at 655. Nonetheless, "the diversion of a company's customers may also constitute irreparable harm." *Samsung Am. Inc.*, 2006 WL 3627072, at *15. It is evident that Plaintiff has lost one of its most significant clients, although whether this is a result of Defendants' conduct or Plaintiff's own transgressions is unclear at this stage. Additionally, the oft-malicious and aggressive nature of Defendants' communications via Facebook Messenger evince an ill will towards Plaintiff and

Plaintiff's business. (*See* Compl. ¶¶ 77, 81–82, 84.) Defendants occupy the same niche professional sphere as Plaintiff and undoubtedly will pose a threat to Plaintiff's business—possibly intentionally and likely de facto. Thus, Plaintiff has demonstrated a likelihood of irreparable harm.

Defendants also argue that the significant delay in seeking injunctive relief cuts against future irreparable harm. (Defs.' Opp'n at 26.) The case law on which Defendants rely is distinguishable to the instant case. Plaintiff did take some time to prepare its Complaint during which it could have more quickly sought relief, and this preliminary injunction process has been drawn out. Nevertheless, Plaintiff promptly sought a TRO upon filing its Complaint, which has now been in place since early April. *Cf. Smart Vent Prods. v. Crawl Space Door Sys.*, 2016 WL 4408818, at *12 (D.N.J. Aug. 16, 2016) (sought an injunction April 28, 2016 for events that occurred in Fall 2015); *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 382 (D.N.J. May 14, 2002) (knew of potential for trademark infringement long before filing civil action and seeking injunctive relief).

C. Potential Harm to Defendants and the Public Interest

Defendants generally argue the injunction sought is over broad, open-ended, and will harm their ability to do business in and "enhance" the telecommunications engineering industry. (Defs.' Opp'n at 27, 29.) They also argue that it will harm those individuals who have stakes in the Defendant companies but are not directly involved in this litigation. (*Id.* at 28.) The Court notes that the TRO limitations are identical to those sought by Plaintiff with this application, and Defendants have raised no argument that these limitations have been detrimental to them or their businesses. Notably, the briefing focuses on the merits and unclean hands arguments, with little

attention given to these factors. Without a greater showing by the parties, neither factor undermines the foregoing analysis.

## CONCLUSION

Plaintiff seeks to continue the restraints imposed by the TRO in the form of a preliminary injunction until a resolution on the merits is reached in this case. With serious consideration of the detailed briefs, exhibits, and deposition testimony put forth, as well as the parties' representations at oral argument, the Court finds that such a preliminary injunction is warranted. The Court notes, however, that many of Plaintiff's arguments have tenuous footing under the law. Plaintiff has only successfully met its burden for a strong likelihood of success on the merits with respect to the duty of loyalty claims for the individual Defendants. The Court was most persuaded that Plaintiff faces potential continued harm during the pendency of this litigation. For the foregoing reasons, Plaintiff's Motion is granted. An appropriate Order will follow.

Date: 7/26/18

*Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.